**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **ANNA MARIE BOLET,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO.: 1:18-cv-481** |
| | § | |
| | § | |
| | § | |
| **INSYS THERAPEUTICS, INC.,** | § | **JURY DEMANDED** |
| | § | |
| *Defendant.* | § | |
| | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES, Plaintiff, Anna Marie Bolet, in the above-styled and numbered cause, and files this her Original Complaint and Jury Demand against Defendant, Insys Therapeutics, Inc., and for cause of action will show to the Court as follows:

### I. PARTIES

1. Plaintiff is an individual residing in Austin, Travis County, Texas. Plaintiff was employed as a Regional Sales Manager by Defendant in Dallas, Texas.

2. Defendant, INSYS Therapeutics, Inc., is a foreign for-profit corporation incorporated in the State of Delaware. Defendant regularly conducts business in Williamson County, Texas. Defendant has been served with a request for waiver of service by serving its registered agent, CT Corporation System, at 1999 Bryan Street, Suite 900, Dallas, Texas, 75201.

### II. JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as Plaintiff's causes of action arise under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, *et*

*seq.*, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a).

4.     Venue is proper in the United States District Court of the Western District of Texas, Austin Division, because Defendant has significant contacts within this district, and the events that give rise to this cause of action occurred in this district.

### III.     NATURE OF THE ACTION

5.     This is an action against Defendant for violations of the Americans with Disabilities Act of 1990, as amended ("ADAAA"), 42 U.S.C. §§ 12101, *et seq.*  Specifically, Plaintiff complains that Defendant discriminated against her and created a hostile work environment on the basis of her actual and perceived disability, and subsequently retaliated against her after engaging in a protected activity by terminating her employment in violation of the ADAAA.

6.     This is also an action against Defendant for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2(a), 2000e-2(k), and 2000e-3(a). Specifically, Plaintiff contends that Defendant discriminated against her and created a hostile work environment on the basis of her sex (female) and retaliated against her by terminating her employment in violation of Title VII.

### IV.     CONDITIONS PRECEDENT

7.     All conditions precedent to jurisdiction have occurred or been complied with.

8.     Plaintiff filed her charge of discrimination with the EEOC on November 18, 2016 (Charge No. 451-2017-00433) and received her Notice of Right to Sue on March 8, 2018. Plaintiff's Original Complaint is being filed within 90 days of receiving her Notice of Right to Sue.

### V.     FACTS

9.     Ms. Bolet was hired by INSYS in February, 2013, as a Regional Sales Manager for the

Dallas Region.

10.     Although Ms. Bolet had been told by Alec Burlakoff, INSYS' then Vice President of Sales, that her salary would be $100,000 a year, when she began working for the Company, she was very surprised to see that her Employment Agreement indicated a salary of $90,000.

11.     Nevertheless, because she had already agreed to take the position and could not forego working at that time, she accepted the position and began her work for the Company at the reduced salary.

12.     Around that same time, Ms. Bolet learned that men were being hired by the Company in the same positions, Regional Sales Managers, but were paid higher salaries - between $20,000 and $30,000 more. Despite her frustration with being paid less than she agreed to and less than her male co-workers with identical jobs, Ms. Bolet proceeded to excel in her position.

13.     Throughout 2013, Ms. Bolet felt heavy pressure from her supervisors and INSYS management to hire young, white, blonde females as sales representatives. She later learned that John Kapoor, ISNYS Chief Executive Officer, preferred this demographic for sales representative and preferred the Company to hire these and other young attractive representatives, despite their experience (or lack thereof).

14.     In fact when Ms. Bolet hired Ms. Diana Maldonado, who is Hispanic, she directly received negative feedback from Mr. Burlakoff. She was told by Mr. Burlakoff that both Michael Babbich, who was INSYS' Chief Executive Officer at that time, and Dr.Kapoor had indicated to him that Ms. Maldonado did not meet their preferred demographic, although Ms. Maldonado was abundantly qualified for the position.

15.     Ms. Bolet was then threatened by Mr. Burlakoff and told that Ms. Maldonado would be kept on a "very short leash." Ms. Bolet was never told this about other younger, White, "more

attractive," female sales representatives.

16.     Dr. Kapoor's attitude is intrinsic in the INSYS culture. Attractive and young women are preferred for sales positions but they are paid less than their male counterparts. Women are also treated less favorably than men who hold the exact same positions.

17.     For instance, Ms. Bolet was repeatedly forced to manage male Sales Representatives who were unprofessional, insubordinate, who created compliance liabilities and who had sexual harassment claims brought against them constantly. Although Ms. Bolet complained repeatedly to Human Resources and to her supervisors about these issues, the matters were always ignored or brushed under the rug.

18.     Despite the sexist and misogynistic environment she was forced to endure, by December, 2013, Ms. Bolet had doubled her net sales every quarter since she began working for the Company, and her region had proven to be very successful.

19.     In January and February, 2014, INSYS saw a great deal of success and the Company began an extensive expansion. Between June and December 2014, Ms. Bolet's district was one of the top performing districts in the U.S. Her net sales continued to double as well.  There is absolutely no doubt that Ms. Bolet was quite successful in her endeavors and that she was an asset to the Company.

20.     Nevertheless, despite Ms. Bolet's accomplishments and the Company's success, the INSYS expansion saw numerous male Sales Managers hired who were brought on with higher salaries than women Sales Managers despite the fact that all of the Sales Managers had the exact same duties.

21.     In December, 2014, unfortunately Ms. Bolet suffered a very serious ski accident and was forced to take medical leave due to an injury to her knee.

22.     Ms. Bolet required an extensive and complicated surgery and was unable to walk following her injury because she was ordered to remain immobile and was in a cast. She was unable to bear any weight on her injured leg for eight full weeks before she could begin physical therapy.

23.     Her leave began on or around December 30, 2014, the date of her surgery. She was out of the office for the entire month of January, 2015.

24.     While she was out on disability leave, the Director of Sales Operations, Xun Yu (who is also the person who assesses Company bonuses) moved three of Ms. Bolet's best customers to another (male) Sales Manager.

25.     This meant that the other manager got credit for any sales that occurred during that period and Ms. Bolet's bonus was directly (and negatively) impacted. When she returned from disability leave on February 2, 2015, (while still on crutches and eight weeks earlier than anticipated due to the fact that she was being treated negatively while out on leave); she also learned that her first quarter 2015 bonus would not be paid in full but instead would be prorated.

26.     It was at this time that Ms. Bolet realized that her medical leave had impacted her employment and that she was being directly discriminated against based not only on her disability but on the fact that she had taken disability leave.

27.     In late February, early March 2015, Ms. Bolet was unexpectedly told by her direct supervisor at that time, Sunrise Lee, Regional Director for the West Coast, that she would not receive a portion of the bonus. This made no sense because she had received continual accolades and remained the top third Sales Manager.

28.     Ms. Lee told Ms. Bolet that Mr. Babbich simply "did not feel that she deserved" a portion of her bonus. When Ms. Bolet asked Ms. Lee for clarification, she never received any

explanation and remained in the dark about why her bonus had not been paid. The only thing that had changed during this time was the fact that Ms. Bolet had taken an extensive medical leave. There is simply no other explanation for her not receiving the bonus other than her being out on leave.

29.     When Ms. Bolet returned from medical leave, she learned that Lance Clark, another male Sales Manager, was taking away certain choice customers from Ms. Bolet's team. She also learned that her Sales Representatives were being bullied by Mr. Clark.

30.     She reported this bullying and offensive behavior around the third or fourth week of February, 2015 to Ms. Lee and Mr. Burlakoff. Despite her complaints, nothing was done and Mr. Clark continued to relentlessly harass Ms. Bolet's team members, which ultimately resulted in two of her sales representatives resigning from the Company.

31.     It is clear here that male Sales Managers are undoubtedly treated better than female Sales Managers and that bullying, offensive behavior and stealing customers is absolutely tolerated, if not encouraged at INSYS, with regard to its male employees.

32.     In March 2015, Ms. Bolet attended the INSYS National Sales Meeting. Although she remained the third top Company Sales Manager, she was nevertheless passed over to win the President's Club award. At the time, Ms. Bolet was still on crutches and she was not expected to return to work. Mr. Clark was awarded the President's Club award instead, despite his underhanded tactics.

33.     At that National Sales Meeting, Ms. Bolet had numerous discussions with Danielle Davis, INSYS Director of Compliance. Ms. Davis commended Ms. Bolet for her leadership and for her commitment to the Company – including attending the National Sales Meeting while she was still unable to walk and still on crutches.  Ms. Davis was so content with Ms. Bolet's work

that she encouraged her to apply for a promotion.

34.     On or around April or May 2015, when a new layer of the Leadership team was created, Ms. Bolet was passed over for a promotion, despite her undoubtable eligibility, and was shockingly and directly told by Karen Hill, Area Sales Director, that the executive team had confirmed that this was "because of her disability."

35.     Ms. Bolet then learned that she would be reporting to Crystal Goodiel, who had been promoted to Area Sales Director. Thus, not only was Ms. Goodiel, who did not have a disability, promoted, but Ms. Bolet found this very curious because she knew that Ms. Goodiel had been involved with a DOJ investigation the year prior and had only been promoted to the Areas Sales Director position in the second quarter of 2015.

36.     It was suggested by Karen Hill that Ms. Bolet was passed over for the promotion in favor of Ms. Goodiel because Ms. Bolet had taken disability leave and would remain on crutches until April 27, 2015.

37.     Ms. Bolet had by then been with the Company for over two years; had received numerous accolades from others; and had repeatedly met her goals, if not exceeded them. Around this same time, several INSYS male District Sales Managers, many of whom have known reputations for not observing compliance laws and/or who have been involved in investigations by the U.S. Department of Justice ("DOJ"), were promoted to Area Sales Director.

38.     From June through August, 2015, the DOJ conducted an investigation into INSYS regarding fraud, illegal kickbacks, and drug charges. The negative media coverage caused the Company to suffer business losses.  Much of the investigation and ensuing lawsuits involved INSYS' Speaker Programs.

39.     As a result of this, many of Ms. Bolet's INSYS Speakers assigned to her district had

removed themselves from the INSYS Speaker Bureau and this made it a challenge to schedule Speaker Programs at the frequency that was expected.

40.     Mr. Yu was in charge of the Speaker Programs and Ms. Bolet heard around this time that he was discussing certain managers whom he called "Personal Enemies." He called them this name because these particular managers were not scheduling as many Speaker Programs as he wanted. Ms. Bolet then learned that she had made Mr. Yu's illustrious list of "Personal Enemies."

41.     In November and December, 2015, Ms. Bolet was forced to take disability leave again because she required another major surgery on her injured knee. Although Ms. Bolet was advised by her physician to take eight weeks off to heal properly, she felt enormous pressure to return to work, based on the fact that she was treated so poorly the first time she took disability leave and she feared that her job would be in jeopardy if she took the full eight weeks that her doctor recommended.

42.     Despite the fact that she was on disability leave, Ms. Goodiel continued to reach out to Ms. Bolet during her leave. Ms. Goodiel called Ms. Bolet at home and on her personal cell phone frequently and even asked Ms. Bolet to return from leave early in order to travel to Chicago for a meeting.

43.     Ms. Goodiel had no respect whatsoever for the fact that Ms. Bolet had suffered a grave injury and required surgery. In fact, by her treatment of Ms. Bolet, Ms. Goodiel made it very clear that she had little sympathy for Ms. Bolet or her condition, and she made it very clear to Ms. Bolet that despite her condition, there were issues that needed her immediate attention (as directed by Dr. Kapoor) and that she needed to return to work as soon as possible.

44.     Following her return from medical leave (on December 14, 2015, and two weeks earlier

than advised by her physician), Ms. Bolet's bonus was once again prorated to reflect the six weeks time spent on disability leave.

45.     When she returned from leave, Ms. Bolet was immediately sent by Ms. Goodiel to Chicago for a Town Meeting to meet with the new Chief Operating Officer Dan Brennan. She was forced to travel and to attend this meeting although she had just returned from disability leave and was still participating in extensive physical therapy.

46.     During this meeting, one of the topics discussed was territory adjustments. Ms. Bolet had requested a territory adjustment from Mr. Yu the week prior to her surgery. It was at this meeting that Mr. Goodiel informed her that Mr. Yu had ignored her request because "he did not like Ms. Bolet."

47.     It was also at this meeting that Mr. Brennan made the observation that it was unusual Mr. Yu as Director of Sales Operations for the Company, would have any control over the bonus structure, and he said this to the team of managers present at this meeting.

48.     Ms. Goodiel offered no other explanation for the denial. It was at that time that Ms. Bolet began to feel that Ms. Goodiel was setting her up for failure. Never before had a supervisor of sales territories and bonuses ignored business requests from the field. This was particularly strange too because Ms. Bolet had clearly proven herself.

49.     Although she asked Ms. Goodiel for more information, she never received it. After this meeting in Chicago, Ms. Bolet reported Mr. Yu's behavior regarding his arbitrary decision as well as Ms. Goodiel's feedback to H.R. It was clear that Mr. Yu had taken advantage of the fact that Ms. Bolet was on disability leave for six weeks. Despite her complaints, nothing was ever done about this.

50.     Shortly thereafter, Ms. Goodiel began to write Ms. Bolet up; to micromanage her; and to

find fault in her work where previously there had been none. For instance, just shortly after she returned from disability leave, and for the first time in two years with the Company, around January 25, 2016, Ms. Bolet received a Written Warning because she sent emails to herself.

51.     Ms. Bolet was the only person on the sales force, to her knowledge, to _ever_ be written up for sending an email to herself. Thus it is clear that Ms. Goodiel and HR had begun to look into Ms. Bolet's work and email and were trying to find any reason to get rid of her based on her taking disability leave and due to her disability.

52.     Around March 23, 2016, Ms. Bolet met with the Director of Training and Development, Darin Fila. During the meeting Mr. Fila acknowledged that Ms. Bolet was doing a very good job and told her that she had done a lot to develop as a manager for the Company.

53.     Around the second week of April, 2016, Ms. Bolet received a Retention Bonus. Around this same time, Ms. Bolet received an Award from the Board of Directors for her Leadership Service in the form of 3,000 stock options. Despite the fact that there is no doubt that Ms. Bolet was qualified for her job and that she was doing it very well, Ms. Goodiel continued to treat Ms. Bolet differently than she did prior to Ms. Bolet's accident and medical leave.

54.     At this time it was becoming more and more evident to Ms. Bolet that Ms. Goodiel wanted her out based on her disability and the fact that she had taken medical leave.

55.     In April, 2016, Ms. Bolet received a Second Warning/Friendly Reminder pertaining to late expenses. She does not recall ever receiving a first Warning/Friendly Reminder. In any event, this type of Reminder was very common and everyone (managers, sales representatives, etc.) received them with regularity.

56.     Ms. Bolet submitted her corrections within twenty four hours, as she always did. Despite the fact that she did so, she still received an Official Written Warning.  This was Ms. Bolet's

second Written Warning in less than a four month time span. These warnings also only came <u>after</u> she took medical leave and after her injury. Prior to her injury Ms. Bolet had a completely clean record with the Company.

57.     On or around April 1, 2016, the company reported its 1st Quarter 2016 Earnings to Wall Street. These earnings were well below projected earnings. Around this same time, Ms. Bolet exercised a portion of her stock options. When an employee exercises his/her stock options the Board of Directors and Dr. Kapoor are immediately notified.

58.     After she did so, Ms. Bolet was immediately concerned that she was a target. She was concerned not only because of her stock option earnings but also because she had just returned from disability leave.

59.     On April 14, 2016, a Speaker Program was cancelled. Ms. Bolet was given conflicting reports over who cancelled the program but was told that there would be an investigation.  Ms. Bolet was unconcerned because in her entire career she had never had any Speaker Program violations.

60.     On May 16, 2016, Ms. Goodiel told Ms. Bolet that she was being issued an Official Written Warning for a canceled Speaker Program which had occurred a month before. Not only was this Warning not given to her until a month after the fact, but the Warning was not done in accordance to INSYS procedure.

61.     After discussing the facts of the warning with Ms. Goodiel and explaining to her that the information she had was incorrect, Ms. Goodiel agreed to change the Written Warning into a Verbal Warning. Ms. Goodiel however, continued to search for reasons to find fault with Ms. Bolet and continued to retaliate against her relentlessly.

62.     On May 17, 2016, Ms. Bolet worked with Sanga Emanuell, V.P. and Director of

Compliance, and joined him in meetings with customers. Ms. Bolet first met Mr. Emanuell in the lobby of the hotel they were both staying at so that the two of them could take a taxi to the restaurant together.

63.     This is normally against compliance rules for a manager and a sales representative to attend a dinner meeting with customers, but Mr. Emanuell insisted that he was going to do things his way and that Ms. Bolet needed to come along.

64.     From the very beginning, Ms. Bolet felt very uncomfortable being with Mr. Emanuell. Mr. Emanuell immediately gave Ms. Bolet "elevator eyes" when he first saw her (he looked her up and down) and continually looked at her inappropriately when the two of them worked together. Following this initial meeting Ms. Bolet felt very intimidated and uncomfortable having to work so closely with Mr. Emanuell.

65.     On May 18, 2016, Ms. Bolet and Mr. Emanuell met with Dr. Noor Gajraj, an INSYS customer and pain management specialist. Dr. Gajraj had recently distanced himself from the Company and had removed himself form the INSYS Speaker Bureau in August 2015 citing the DOJ investigation (which Ms. Goodiel was involved in), as the reason.

66.     Mr. Emanuelle had given Ms. Bolet the impression that the meeting with Dr. Gajraj was intended to address his concerns and to put them to rest.

67.     To Ms. Bolet's surprise and dismay, during this meeting the subject matter quickly turned away from sales and products and instead turned sexual in nature. This conversation could (and should) have been stopped immediately by Mr. Emanuell but instead, he encouraged this inappropriate discussion by laughing and encouraging Dr. Gajraj.

68.     This resulted in provoking and encouraging inappropriate comments and sexual advances from Dr. Gajraj which made Ms. Bolet very uncomfortable. Dr. Gajraj and Mr. Emanuell

proceeded to talk about other women employees during this meeting and discussed having sex with one INSYS employee in particular.

69.     The two men talked about having this employee "underneath" them and about "ruining" her. They then laughed hysterically about this. The two even discussed sexual harassment and laughed about how they could avoid being caught.  Dr. Gajraj repeatedly asked if this employee was "single."

70.     Following the meeting, Ms. Bolet discussed the inappropriate discussion with Mr. Emanuell. Mr. Emanuell asked Ms. Bolet if she had any 'male representatives' in her district that could call on Dr. Gajraj.

71.     Despite the fact that Mr. Emanuell acknowledged Dr. Gajraj's inappropriate behavior, he still directed Ms. Bolet to act not only as the Sales Manager, but also the Sales Representative to Dr. Gajraj since there were no male sales representatives in the district to do so. Mr. Emanuell clearly had absolutely no issues with the fact that Dr. Gajraj had acted inappropriately and in a harassing manner.

72.     That same evening Mr. Emanuell again insisted that Ms. Bolet attend a dinner meeting with another doctor. Not only was this a violation of The Sunshine Act, but Mr. Emanuell, as INSYS Chief Compliance Officer, should have known that this was a violation.

73.     Nevertheless Mr. Emanuell had no concern whatsoever for The Sunshine Act or for the fact that this meeting was unethical and a violation of compliance laws. Ms. Bolet again questioned attending the meeting and Mr. Emanuell insisted that she attend.

74.     After she had questioned the meetings and complained about Dr. Gajraj's behavior, Mr. Emanuell began to treat Ms. Bolet differently and to single her out. For instance, on May 19, 2016, Mr. Emanuell worked with Ms. Bolet and one of her representatives Paige McMinn.

75.     Mr. Emanuell seemed to be very unhappy with Ms. Bolet and unhappy that she complained about attending the previous meetings with him. Mr. Emanuell began to micromanage Ms. Bolet and he even screamed at her in front of Ms. McMinn. Mr. Emanuell got so angry during this conversation that he began to bang his cell phone against his head while he was yelling.

76.     Mr. Emanuell's behavior was very bizarre and was very clearly meant to intimidate Ms. Bolet.  In fact, even Ms. McMinn acknowledged to Ms. Bolet that Mr. Emanuell seemed to have it "out for her." On the evening of May 19, 2016, Mr. Emanuell demanded an audience with another customer and insisted that both Ms. Bolet and Ms. McMinn be present although this was again in direct violation of the Sunshine Act. Based on all of Mr. Emanuell's inappropriate and unethical actions, on May 20, 2016, Ms. Bolet reported his behavior to INSYS Director of Human Resources Dan Pon.

77.     On May 24, 2016, Ms. Bolet also reported Mr. Emanuell's behavior to another Area Sales Manager, Karen Hill. Ms. Bolet was shocked to learn from Ms. Hill that Mr. Emanuell had touched her inappropriately and then had gotten angry when she refused to travel to Atlanta with him the next day.

78.     Ms. Hill told Ms. Bolet that she was afraid to come forward about the sexual harassment because she was involved in the DOJ investigations and was afraid that that Mr. Emanuell would withdraw his protection of her if she complained. Ms. Hill also confided in Ms. Bolet that other female managers had complained to her about Mr. Emanuell but were also afraid to complain to the H.R. department. Ms. Bolet immediately reported these discussions to Ms. Goodiel

79.     Following her complaints about Mr. Emanuell, Ms. Goodiel began to retaliate against Ms. Bolet even more. Not only did she do nothing about Ms. Bolet's complaints, instead Ms.

Goodiel began to track Ms. Bolet's every move and to micro-manage her where she had not done so in the past.

80.     Ms. Goodiel also began to ask Ms. Bolet's Sales Representatives if Ms. Bolet had another job.  Ms. Bolet's Sales Representatives then became very fearful and a general mistrust of her and her authority becomes rampant throughout her region.

81.     On May 26, 2016, Mr. Pon concluded his investigation into Ms. Bolet's allegations about Mr. Emanuell.  Despite the seriousness of Ms. Bolet's complaints, Mr. Pon completely brushed her concerns aside and merely told her, "this is all a big misunderstanding. He is a quirky guy!" Needless to say, H.R.'s investigation was concluded and absolutely nothing was done about the sexual harassment and retaliation complaints Ms. Bolet had made against Mr. Emanuell.

82.     Following Ms. Bolet's complaint and INYS subsequent "investigation," Ms. Bolet was out sick. From May 31, 2016 through June 3, 2016, Ms. Bolet took sick time. Despite the fact that she was out of the office, Ms. Goodiel never stopped contacting her at home and harassing her on a daily basis.

83.     On June 3, 2016, Ms. Bolet reported Ms. Goodiel's retaliatory behavior to Mr. Pon, but he failed to conduct any investigation or to follow up whatsoever. It was at this point, however, that Ms. Bolet knew her days were numbered. Ms. Goodiel began to find fault in everything she did.

84.     On June 6, 2016, the ISP Department sent a notice to Ms. Maldonado and sent a courtesy copy to Ms. Bolet regarding corrections needed on post documentation from a Speaker Program which Ms. Maldonado conducted on May 31, 2016. INSYS policy states that Speaker Program documentation must be submitted no later than 24 hours after the program has been executed.

85.     Nevertheless, here the ISP Department waited <u>seven days</u> to "discover" a mistake had

been made and to alert Ms. Maldonado and Ms. Bolet about it. This Program occurred under Ms. Bolet's direction. The ISP Department gave Ms. Maldonado and Ms. Bolet twenty four hours to submit the post documentation.  Ms. Maldonado and Ms. Bolet got the documentation submitted and Ms. Bolet believed that the matter was resolved.

86.    On June 13, 2016, the ISP Department notified Ms. Maldonado again that she had not submitted her post documentation for the Speaker Program on May 31, 2016. This caused a great deal of confusion because she had in fact submitted the documents several days earlier.

87.    This was also quite questionable because the ISP Department had waited two weeks to "discover" the mistake and this occurred directly following Ms. Bolet's complaints about Mr. Emanuell.  Ms. Bolet attempted several times to call the Compliance department about the issue; however, her calls were never returned. This was also very odd because in the past her phone calls were answered immediately and/or usually within just a few hours. It was clear at this point that Ms. Bolet was being ostracized and set up for termination.

88.    That same day, on June 13, 2016, Ms. Bolet received an Official Written Warning regarding the April 14th Speaker Program.  At the time she had discussed this with Ms. Goodiel, Ms. Goodiel had agreed to only give her a Verbal Warning following their discussion and Ms. Bolet's explanation of the events. This was highly unusual. Not only was the Warning given months after the discussion with Ms. Goodiel, but it was unmistakable that INSYS was "stacking" complaints against Ms. Bolet in order to develop a history for her termination, albeit a false history.

89.    Just a few days later, on June 17, 2016, Ms. Goodiel told Ms. Bolet that Ms. Maldonado and Ms. Bolet would both be given a written reprimand for the May 31st Speaker Program documentation issue.

90.     This made absolutely no sense because that issue had been immediately corrected. That same day, Ms. Bolet was terminated based on the aforementioned write ups; all of which were completely unfounded.

91.     At her termination meeting Ms. Bolet was told by Ms. Goodiel and Mr. Pon that she was terminated because she had received two Written Warnings in such a short period of time. This is not only false, but the timeline itself makes it clear that Ms. Bolet had been set up.

92.     Ms. Bolet did not begin to receive write ups until after she went out on disability leave. Once she returned, Ms. Goodiel seemed to make it her mission to force Ms. Bolet out. After she complained about Mr. Emanuell and his inappropriate and offensive behavior, it seems as if INSYS had grown tired of her complaints.

93.     The Company then manufactured a reason to force her out following two unsubstantiated and unfounded write ups.  There is simply no other reason for Ms. Bolet's termination other than her complaints and the fact that she took disability leave and suffered from a disability.

## VI.     CAUSES OF ACTION

### COUNT 1 – ACTUAL AND PERCEIVED DISABILITY DISCRIMINATION PURSUANT TO THE AMERICANS WITH DISABILITIES ACT OF 1990, AS AMENDED (ADAAA)

94.     Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

95.     Plaintiff is a qualified individual within the meaning of the ADAAA (42 U.S.C. § 12111(8)).

96.     Defendant is an employer and cover entity under the ADAAA (42 U.S.C. §§ 12111(2), (5)(A)).

97.     Plaintiff was an employee of Defendant under the ADAAA (42 U.S.C. § 12111(4)).

98.     Plaintiff suffered from a disability as a result of her ski accident. As such, Plaintiff suffers from a disability—a physical impairing condition that substantially limits a major life activity, including, sitting, walking, and working—within the meaning of the ADAAA (42 U.S.C. §§ 12102(1)(A), 2(A)&(B)).

99.     Defendant regarded or perceived Plaintiff as having a disability within the meaning of the ADAAA (42 U.S.C. §§ 12102(1)(C), (3)(A)).

100.    Defendant discriminated against Plaintiff on the basis of his disability in violation of the ADAAA  (42 U.S.C. § 12112).

101.    Defendant unlawfully terminated Plaintiff's employment because of her actual and perceived disability.

### COUNT 2: HOSTILE WORK ENVIRONMENT BASED ON DISABILITY PURSUANT TO THE ADAAA

102.    Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

103.    Plaintiff was subjected to unwelcome harassment based on her disability when she began to receive unwarranted write-ups after taking medical leave, leading to her termination.

104.    The harassment complained of affected a term, condition or privilege of Plaintiff's employment in that it, among other affects, affected her ability to succeed at her job and caused her severe emotional stress.

105.    Defendant knew or should have known of the harassment, based on Plaintiff's complaints and failed to take prompt, remedial action.

106.    As a direct and proximate result of Defendant's intentional actions, Plaintiff has suffered severe emotional distress, physical and emotional pain, suffering, inconvenience, mental anguish and other non-pecuniary losses.

107.    As a result of Defendant's intentional actions, Plaintiff has suffered and is likely to continue to suffer pecuniary loss, among other things, in the form of lost income and benefits in an amount to be determined at trial.

### COUNT 3: RETALIATION PURSUANT TO THE ADAAA

108.    Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

109.    Defendant retaliated against Plaintiff by terminating her employment after she complained of disability discrimination during her employment with Defendant in violation of 42 U.S.C. § 12203.

110.    As a direct and proximate result of Defendant's intentional retaliatory actions, Plaintiff has suffered severe emotional distress, physical and emotional pain, suffering, inconvenience, mental anguish, and other non-pecuniary losses.

111.    As a result of Defendant's intentional retaliatory actions, Plaintiff has suffered and is likely to continue to suffer pecuniary loss, among other things, in the form of lost income in an amount to be determined at trial.

112.    Plaintiff has incurred and will continue to incur attorney's fees, litigation expenses, and costs in pursuing his claims for retaliation under the ADAAA.

### COUNT 4: SEX DISCRIMINATION PURSUANT TO TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000e-2(a)

113.    Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

114.    Defendant intentionally engaged in unlawful employment practices involving Plaintiff because of her sex (female) when Defendant failed to compensate Plaintiff as her counterparts and when it terminated Plaintiff's employment.

115.    Defendant discriminated against Plaintiff in connection with the compensation, terms, conditions and privileges of employment, or limited, segregated, or classified Plaintiff in a manner that would deprive or tend to deprive her of any employment opportunity or adversely affect her status because of Plaintiff's sex (female) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a).

### COUNT 5: HOSTILE WORK ENVIRONMENT BASED ON SEX PURSUANT TO TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED.

116.    Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

117.    Plaintiff was subjected to unwelcome harassment based on her sex when her supervisor made sexual comments and advancements to her.

118.    The harassment complained of affected a term, condition or privilege of Plaintiff's employment in that it, among other affects, affected her ability to succeed at her job and caused her severe emotional stress.

119.    Defendant knew or should have known of the harassment, based on Plaintiff's complaints and failed to take prompt, remedial action.

120.    As a direct and proximate result of Defendant's intentional actions, Plaintiff has suffered severe emotional distress, physical and emotional pain, suffering, inconvenience, mental anguish and other non-pecuniary losses.

121.    As a result of Defendant's intentional actions, Plaintiff has suffered and is likely to continue to suffer pecuniary loss, among other things, in the form of lost income and benefits in an amount to be determined at trial.

## COUNT 6: RETALIATION PURSUANT TO TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000e-3(a)

122.    Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

123.    Defendant retaliated against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), after engaging in protected activities by terminating Plaintiff's employment after she made protected complaints of sex discrimination and sexual harassment.

## VII.    JURY DEMAND

124.    Plaintiff demands a jury on all issues to be tried in this matter and herein submits the jury fee.

## VIII.    PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, the Court award a judgment against Defendant for the following:

    a.    All damages to which Plaintiff may be entitled pursuant to this Original Complaint, or an amendment thereto, including but not limited to back pay, reinstatement, upgrading, and compensation for benefits not received;

    b.    Past physical pain and mental suffering;

    c.    Present physical pain and mental suffering;

    d.    Future physical pain and mental suffering;

    e.    Punitive damages in an amount above the minimum jurisdictional limits of the Court;

    f.    Reasonable attorneys' fees as allowed by law, with conditional awards in the event of appeal;

g.      Pre-judgment interest at the highest rate permitted by law;

h.      Post-judgment interest from the judgment until paid at the highest rate permitted by law;

i.      Costs of Court;

j.      Injunctive relief; and

k.      Such other and further relief, at law or in equity, to which Plaintiff may be entitled, whether by this Original Complaint or by proper amendment thereto.

Respectfully submitted,



_____
Alfonso Kennard, Jr.
Texas Bar No. 24036888
2603 Augusta Drive, Suite 1450
Houston, Texas 77057
(713) 742-0900 (main)
(713) 742-0951 (facsimile)
alfonso.kennard@kennardlaw.com

**ATTORNEY-IN-CHARGE FOR PLAINTIFF**